[Civ. No. 33861.  Second Dist., Div. Two.  Mar. 17, 1970.]

GENERAL INSURANCE CO. OF AMERICA, Plaintiff and Respondent, v. COMMERCE HYATT HOUSE et al., Defendants and Appellants.

## COUNSEL

Richards, Watson & Hemmerling and Robert L. Hitchcock for Defendants and Appellants.

Booth, Mitchel, Strange & Willian and George C. Mitchel for Plaintiff and Respondent.

## OPINION

**HERNDON, J.—**

### Statement of the Case

Respondent General Insurance Company of America brought this action to recover money alleged to be due and owing from appellants upon a

written contract for the construction of a hotel building and related facilities and for extra work performed beyond that called for in the contract.

Respondent was the surety on the performance bond of Centron Construction Company, the original contractor. During the course of construction Centron defaulted and appellants demanded that respondent perform in conformity with the terms of its bond. Accordingly, respondent undertook performance of the contract. Defendants and appellants Commerce Hyatt House, a joint venture, and its components, Herman Investment Company, a copartnership, Hyatt Corporation of America, a corporation, and Burcru Realty Corporation, were the owners who contracted with Centron.

In its complaint respondent alleged that its principal had defaulted in the performance of the construction contract and that it had undertaken and completed performance by virtue of its obligations under the terms of the performance bond. Respondent further alleged in substance that by reason of the failure of appellants to pay the amount which remained due and owing under the contract as adjusted by the parties during the course of performance and appellants' failure to pay for extra work authorized by them and not called for by the construction contract, there was a balance of $163,539.96 plus interest owing from appellants to respondent.

By their answer appellants denied that they were indebted to plaintiff and alleged that they were entitled to receive from respondent a complete accounting which had not been provided. The answer further alleged by way of counterclaim that appellants were entitled to $57,500 for liquidated delay damages, and the sum of $3,622.17 for additional architectural fees incurred by reason of the breach of the contract by respondent's principal.

At the conclusion of the nonjury trial the court found that there was a balance due respondent on the adjusted contract price in the amount of $82,399 and that in addition respondent was entitled to recover $49,148.98 for extra work beyond that called for in the contract, the sum of $25,473.13 for overtime labor costs incurred at appellants' request, and $14,798.69 as a reasonable allowance for overhead and profit on the cost of extra work and overtime labor. Respondent was awarded prejudgment interest on all of the sums found to be due except on the sum awarded for overhead and profit on the extra work and overtime items. The prejudgment interest awarded to respondent in the amount of $13,036.40, added to the other amounts above listed, totalled $184,856.20.

The court found that appellants were entitled to credits and offsets in the sum of $22,123.69 by reason of items of work called for by the construction contract but not performed by respondent or its principal Centron.

On the basis of these findings judgment was rendered in favor of respondent in the net sum of $162,732.51.

## Statement of Facts

The construction contract was executed by the parties thereto on November 26, 1962. The basic form of the contract was the "Standard Form of Agreement Between Contractor and Owner for Construction of Buildings" issued by the American Institute of Architects for use when a stipulated sum formed the basis of payment. The form is designated A.I.A. Document No. A-101, 1961 Edition.

By agreement of the parties the original contract was modified to provide that construction would be commenced on January 7, 1963, and that the work would be substantially completed on or before November 4, 1963. It is undisputed that the project was substantially completed on January 14, 1964, or 71 days later than the completion date agreed upon.

The contract provides that "if completion is delayed by general strikes, Act of God, general war or casualty beyond the control of the contractor then the time for completion will be extended for such additional time as shall be caused by such delay or as the architect may decide under Article 18 of the General Conditions of the contract." Article 18 is entitled "Delay and Extensions of Time" and in pertinent part provides as follows:

"If the Contractor be delayed at any time in the progress of the work by any act or neglect of the Owner or the Architect, or of any employee of either, or by any separate Contractor employed by the Owner, or by changes ordered in the work, or by strikes, lockouts, fire, unusual delay in transportation, unavoidable casualties or any causes beyond the Contractor's control, or by delay authorized by the Architect pending arbitration, or by any cause which the Architect shall decide to justify the delay, then the time of completion shall be extended for such reasonable time as the Architect may decide.

"No such extension shall be made for delay occurring more than seven days before claim therefor is made in writing to the Architect. In the case of a continuing cause of delay, only one claim is necessary."

The contract provided that in the event of unexcused delay in completion, the owners could deduct from the contract sum $500 per day for each day of delay. During the course of construction delays resulting from a variety of causes were encountered. Among the causes to which delays were attributable were the difficulties encountered in securing a sufficient number of plumbers. As the result of unusually heavy rains during the months of February and March of 1963, the construction site was flooded. The flood

waters created problems in getting trucks on and off the site; water and mud covered the footings and made it necessary to scrape the footings clean in order to continue the construction.

Delay also resulted from the default of Centron after its president, Robert A. Gray, absconded with more than $200,000 of its funds. Appellants point out that after Gray disappeared "there was practically nobody on the job and it took about four weeks to get the construction going again."

An error in the drawings made by the County of Los Angeles showing incorrect street elevations necessitated corrective work in connection with the design and construction of an on-site sewer. Another cause of delay was a jurisdictional dispute between the plumbers and the carpenters over which trade would install prefabricated plaster shower stalls.

Other delays were caused by changes required by state and county agencies. The Los Angeles County Building and Safety Department required redesign and strengthening of the exterior wall studding of the hotel building. This change was ordered after the walls were approximately half completed and it caused a substantial delay. After the balcony railings had been installed, a State Industrial Safety Commission inspector required that additional rails be installed to prevent people from falling through the railings.

Additional delays were occasioned by changes ordered by the appellants. One such change involved an occupancy rating when the owners decided to permit dancing in the restaurant. To comply with the new occupancy rating the exterior wall had to be redesigned for fire protection. The owners also ordered a change in the design of the portecochere in front of the hotel.

Still other causes of delay included the following: the tardiness of an independent design company in advising the contractor where to install electric outlets and plumbing hookups; a lack of clarity in the architectural details with reference to suspended ceilings; and the inability of the contractor to obtain information from the architects when needed as to how a large room on the second floor of the restaurant building was to be finished as to walls, floor coverings, etc.

Although it is undisputed that numerous of these causes of delay were of such a nature as to entitle the contractor to extensions of time, it is also undisputed that the only requests made by respondent or its principal for time extensions were encompassed in a series of letters addressed by Mr. James Lacey, respondent's superintendent, to the architects and delivered to the architects on November 19, 1963. Each of the delays for which an extension was requested by these letters had occurred more than seven days prior to their delivery to the architect.

At the request of the owners, respondent and its principal performed a substantial amount of extra work in the construction of the hotel and restaurant buildings beyond that called for by the contract, and made changes in the construction varying from the original plans. This extra work was done with the understanding between the parties that the overhead and profit to be allowed the contractor on the extra work would be determined upon completion of construction. The contract provided that any claim for extensions of time caused by the owners ordering extra work or changes "shall be adjusted at the time of ordering such change."

During the course of construction the owners directed that certain work provided for in the contract not be done, or had the work done by others and deleted from the contract. For these items of work the owners claimed and received credit. In order to speed up completion of the construction the owners requested the contractor to use overtime labor. Appellants further claim that because of Centron's default, the architects' representative on the job was required to perform additional supervisory services for which they paid the architects an additional $3,041.92. The trial court found that appellants had not incurred any additional architects' fees by reason of Centron's default and denied their claim to credit for the amount of this payment.

### Appellants' Assignments of Error

The errors assigned by appellants are summarized in their opening brief as follows:

"1. The award of interest on the sums found to be owing for extra work and overtime was erroneous because these sums were not certain or capable of being made certain prior to judgment.

"2. The finding that defendants did not incur any additional architect's fees by reason of the default of plaintiff's principal is unsupported by and contrary to the evidence.

"3. The finding that plaintiff performed all terms and conditions of the contract except as plaintiff was lawfully excused from performance is contrary to the evidence.

"4. The finding that delay in substantial completion was caused solely by the acts of the defendants is contrary to the evidence, and defendants should recover their actual damages for the delays in completion.

"5. The excess labor costs incurred by plaintiff for overtime labor were not chargeable to defendants because these expenses were incurred in mitigation of damages for delay for which plaintiff would have been liable."

## Sufficiency of the Record

At the outset respondent urges that appellants have failed to furnish this court with a complete transcript of the evidence and therefore that their contentions that the trial court's finding of fact are unsupported by the evidence cannot be considered.

It is true, as respondent points out, that the parties entered into a stipulation that the evidence introduced during the trial of a companion case before the same judge immediately preceding the commencement of the trial of the instant case would be "deemed to be introduced in this trial." It is also true that appellants have not provided us with a transcript of the testimony introduced at the former trial.

We recognize the well-settled rule invoked by respondent that where the appellant attacks the sufficiency of the evidence to support findings of fact, he must present the entire record of the evidence before the court below and that the failure to provide the complete record is fatal to the attack. However, we are persuaded that appellants are correct in urging that the record now before this court is substantially complete and entirely adequate to enable us to adjudicate the issues presented by this appeal. Moreover, we have concluded that the evidence contained in the present record is sufficient to support each of the challenged findings of fact; hence, the issue as to the completeness of the record is rendered moot.

## Causes of Delay and the Contractor's
## Right to Extensions of Time for Completion

The trial court found that "The delay in substantial completion of said work was caused solely by the acts of the defendants or by the acts of representatives of the defendants which acts were attributable and chargeable solely to the defendants. The delay in substantial completion of said work was not caused directly or indirectly by any fault, neglect or wrong of plaintiff or of plaintiff's principal, CENTRON CONSTRUCTION COMPANY, or by any person, firm or corporation whose conduct would be attributable to the plaintiff. . . ."

The central and major issue presented by this appeal is this: Is there substantial evidence in the instant record to support the trial court's findings to the effect that the delay of 71 days in the completion of construction resulted from causes chargeable to the owners and that respondent fully performed the contract except as "lawfully excused from performance"?

We answer this question in the affirmative. In addition to other evidence supporting the challenged findings as indicated by our recital of the facts,

there is the testimony of Mr. Lacey, who held the position of job superintendent on the project throughout the construction period. This testimony is proof that the acts of the owners and of independent contractors employed by them and imperfections in the architects' plans accounted for delays amounting to a total of more than 90 days.

Appellants have placed great emphasis upon the undeniable fact that certain of the delays encountered, including that which resulted from Centron's default, necessarily must be charged to respondent and its principal. However, appellants are mistaken in their contention that this undisputed fact is inconsistent with the challenged findings.

One of the basic fallacies in appellants' position is their mistaken reliance upon the provision of Article 18 of the general conditions of the contract that no extension of completion time "shall be made for delay occurring more than seven days before claim therefor is made in writing to the Architect." As we have pointed out in our recital of the facts, it is undisputed that several of the very substantial delays encountered in this case were chargeable to the owners and were of such a nature that the contractor clearly was entitled to claim extensions of the completion date. There is abundant evidence tending to prove that respondent and its principal were entitled to have the completion date extended for a period far in excess of 71 days by reason of delays chargeable to the owners.

The only bar asserted against respondent's right to the benefit of such extensions of the completion date is the fact that claims therefor were not presented within the seven-day period prescribed by Article 18. As we shall show, however, the law which governs the present case requires a holding that respondent's right to claim extensions of the completion date because of delays chargeable to acts of the owners was not barred.

Prior to an amendment enacted in 1965, section 1511, subdivision 1, of the Civil Code of California provided in pertinent part as follows: "The want of performance of an obligation, . . . in whole or in part, or any delay therein, is excused by the following causes, to the extent to which they operate: 1. When such performance . . . is prevented or delayed by the act of the creditor, . . . *even though there may have been a stipulation that this shall not be an excuse;* . . ." (Italics added.)

The decision of the Supreme Court in *Peter Kiewit Sons' Co.* v. *Pasadena City Jr. College Dist.,* 59 Cal.2d 241 [28 Cal.Rptr. 714, 379 P.2d 18], was filed on February 28, 1963. After quoting the pertinent language of section 1511, the decision holds that "An owner who is a party to a construction contract is a creditor within the meaning of section 1511 (*Semas* v. *Bergmann,* 178 Cal.App.2d 758, 762 [3 Cal.Rptr. 277]), and, as the italicized portion of the section makes clear, a provision in an agree-

ment that the contractor is not to be excused for late completion caused by the owner is rendered inoperative by the statute. A provision in a contract which would require the contractor to make an application for an extension of time before he may be excused for a delay caused by the owner's conduct would obviously constitute a substantial limitation on the policy declared by section 1511." (P. 244.) ██ The following from the same decision at page 245 is apposite:

"It should be pointed out that, in the absence of a contractual provision for extensions of time, the rule generally followed is that an owner is precluded from obtaining liquidated damages not only for late completion caused entirely by him but also for a delay to which he has contributed, even though the contractor has caused some or most of the delay. (See 5 Williston on Contracts (3d ed. 1961) p. 764; 15 Am.Jur. 696; 152 A.L.R. 1349, 1359.) Acceptance of the reasoning urged by defendant would mean that, solely because there has been noncompliance with an extension-of-time provision, the position of an owner could be completely changed so that he could withhold liquidated damages for all of the period of late completion even though he alone caused the delay.

"Noncompliance with a provision requiring an application for an extension of time is not a proper basis for holding a contractor liable in liquidated damages for late completion caused by the owner's conduct. The cases of *Roberts* v. *Security T. & S. Bank, supra,* 196 Cal. 557 [238 P. 673], and *Suhr* v. *Metcalfe, supra,* 33 Cal.App. 59 [164 P. 407], are disapproved insofar as they are inconsistent with this view.

"It follows from what we have said that the trial court's finding of excusability must be upheld. This means not only that the denial of liquidated damages must be affirmed but also that defendant is not entitled to any actual damages for late completion."

██ As a general rule, in the absence of a statement by the court of supreme jurisdiction indicating its intention to have its decision applied prospectively only, its decision overruling a former decision is retrospective in operation. "Under traditional theory an overruled decision is considered not to have established bad law, but to have merely misstated the law." (*Forster Shipbuilding Co.* v. *County of Los Angeles,* 54 Cal.2d 450, 458 [6 Cal.Rptr. 24, 353 P.2d 736]; *County of Los Angeles* v. *Faus,* 48 Cal.2d 672 [312 P.2d 680].) Since the contract here involved was executed in November of 1962 and its performance was completed in January of 1964, the *Kiewit* decision and its interpretation and application of Civil Code section 1511, subdivision 1, control the present case.

Appellants have called our attenton to the amendment effective September 17, 1965, which added to subdivision 1 of section 1511 the following

qualifying language: "[h]owever, the parties may expressly require in a contract that the party relying on the provisions of this paragraph give written notice to the other party or parties, within a reasonable time after the occurrence of the event excusing performance, of an intention to claim an extension of time or of an intention to bring suit or of any other similar or related intent, provided the requirement of such notice is reasonable and just."

■ Although appellants are correct in pointing out that the quoted amendment became effective some two years prior to the trial of this action, we hold that it is not applicable in determining the vested rights of parties to a contract which was made and performed long prior to its enactment. As stated in *Wilke & Holzheiser, Inc.* v. *Department of Alcoholic Beverage Control,* 65 Cal.2d 349, 371 [55 Cal.Rptr. 23, 420 P.2d 735]:

"We begin with the general presumption that legislative changes do not apply retroactively unless the Legislature expresses its intention that they should do so. Three of our basic codes provide that no part thereof is retroactive 'unless expressly so declared' (Civ. Code, § 3; Code Civ. Proc., § 3; Pen. Code, § 3); we have held that this language does no more than codify a general rule of construction, applicable as well to statutes containing no such provision. [Citations.]"

In holding that legislative changes designed to affect the validity of contractual provisions and to reflect a change in public policy are presumed to be prospective only in their operation, the following language was used in *Whitmire* v. *H. K. Ferguson Co.,* 261 Cal.App.2d 594, 602-603 [68 Cal.Rptr. 78]:

"Well established is the law that a statute is presumed to be prospective only in operation and will not be retroactively applied unless such intention clearly appears from the language of the statute itself. [Citations.] This is true even though the statute were to be held to be remedial in nature [citation], which we do not so hold.

"Prior to the enactment of [Civil Code] section 2782 a provision in an indemnity contract that the contractor be indemnified against its own negligence by a subcontractor was not against public policy. [Citations.] If a contract conforms to the public policy of the state when made, a subsequent change in public policy will not nullify the contract. [Citation.]"

As we have shown, the trial court's finding with respect to appellants' responsibility for the delay in completion is well supported by evidence tending to prove that construction would have been fully completed prior to the completion date specified in the contract as modified had it not been for delays directly chargeable to appellants.

It is well established that where the owners seek liquidated damages pursuant to the provisions of a contract, they must show that they have strictly complied with all requisites to the enforcement of that contractual provision. An owner whose acts have contributed substantially to the delayed performance of a construction contract may not recover liquidated damages on the basis of such delay.

"Liquidated damages are a penalty not favored in equity and should be enforced only after he who seeks to enforce them has shown that *he has strictly complied with the contractual requisite to such enforcement* [citations]." (*Aetna Cas. & Surety Co.* v. *Board of Trustees,* 223 Cal.App.2d 337, 340 [35 Cal.Rptr. 765].) "The correct rule is that where such delays are occasioned by the mutual fault of the parties the court will not attempt to apportion them but will refuse to enforce the provision for liquidated damages." (*Gogo* v. *Los Angeles County Flood Control Dist.,* 45 Cal.App.2d 334, 344 [114 P.2d 65].)

In view of the evidence proving that but for delays chargeable to the owners the construction of the project would have been completed prior to the completion date agreed upon, it becomes unnecessary to decide the question whether respondent was entitled to further extensions of the completion date by reason of other delays due to causes involving no fault on the part of either party to the contract.

It follows as a matter of course that appellants were not entitled to any allowance of damages by reason of the delay in the completion of the project.

### Liability for Excess Labor Costs

Appellants contend that, although they expressly authorized respondent to employ labor at overtime rates and agreed to pay the additional costs thus incurred, the trial court erred in charging them with the amount thereof. The untenable basis of this contention is the assertion that these additional costs were incurred to mitigate anticipated damage from delayed completion.

The trial court found that these excess labor costs were not voluntarily incurred by respondent in order to mitigate damages but were performed at the instance and request of appellants and in reliance upon their promise to pay all such costs. This finding is supported by the combined testimony of three witnesses, namely, Mr. Herman, one of the principals in the owners' joint venture, Mr. Parker, the architects' representative, and Mr. Hartquist, the contractor's job superintendent.

The testimony of the witnesses named indicates that Mr. Herman gave

this authorization for the use of overtime labor "along towards the end of the job" or, as Mr. Parker expressed it, "I would guess somewhere around the middle of October." When Mr. Herman was asked to state his purpose in authorizing this expenditure he answered, "To speed up the completion of the hotel. It was apparent that it wouldn't get completed on the date we had hoped."

At the time this authorization was given for the use of overtime labor all parties necessarily were well aware of the fact that there had been delays in the completion of the hotel due to a variety of causes and that a very substantial part of the overall delay was chargeable to the owners themselves. In these circumstances the indicated willingness of the owners to pay for the overtime is understandable and the reasonableness of the trial court's finding is apparent.

### Liability for Additional Architectural Fees

■ Appellants contend that the trial court's finding that they incurred no loss or expense for additional architectural fees by reason of Centron's default is unsupported by the evidence. They point to the fact that their architects charged them $3,041.92 for additional architectural services. This charge apparently was in addition to the fees originally agreed upon.

The record, however, fails to establish that the additional charges made by the architects represented charges for additional services required and rendered as a consequence of Centron's default and not encompassed within the general supervisory duties initially undertaken by the architects under their contract with the owners. Furthermore, the record discloses that during the course of construction a number of situations developed in which the architects were required to render substantial additional services wholly unrelated to any default chargeable to respondent. In short, the evidence supports the challenged finding.

### The Award of Interest

■ Finally, appellants contend that the trial court improperly awarded interest from October 20, 1966, to the date of judgment on the amount found to be due respondent for extra work and excess labor costs. It is appellants' contention that there is no evidentiary support for the trial court's finding that these amounts "were sums certain or liquidated amounts or were sums which were capable of being made certain by calculation" so that respondent's right to payment thereof vested on October 20, 1966.

The cost breakdown upon which the trial court based its computations was submitted by respondent on October 20, 1966, in answer to appellants'

Interrogatory No. 17 which requested a detailed analysis of construction costs and expenditures.

Appellants do not question the completeness or the accuracy of respondent's cost breakdown, but they emphasize their reliance upon the fact that there were variances in the amounts claimed by respondent for these extras in various documents filed with the court. They point out that the total amount claimed for extra work and excess labor costs differs by several thousand dollars as it is alleged in respondent's complaint, in its first answers to appellants' interrogatories, and in its trial brief. The figure which the trial court found to be due and owing also varies slightly from each of the totals asserted by respondent.

"[W]hen the exact sum of indebtedness is known or can be ascertained readily, the reason for the denial of interest does not exist (*Conderback, Inc. v. Standard Oil Co.*, 239 Cal.App.2d 664, 690 [48 Cal.Rptr. 901]. If the amount owing can be calculated and determined from statements rendered by the plaintiff to the defendant and the statements are found to be true and correct, it is a matter of mere calculation within the statute (*Coleman Engineering Co. v. North American Aviataion, Inc.*, 65 Cal.2d 396, 407-408 [55 Cal.Rptr. 1, 420 P.2d 713].)" (*Distefano v. Hall*, 263 Cal.App.2d 380, 388 [69 Cal.Rptr. 691].)

In *Conderback, Inc. v. Standard Oil Co.*, 239 Cal.App.2d 664, 690 [48 Cal.Rptr. 901], it was observed that the defendant in that case could not determine the amount it owed until it received from the plaintiff a statement accompanied by supporting data from which to make the determination. The court under the circumstances of that case rejected the argument that the submission of invoices, shop records and books to the defendant constituted a sufficient basis for him to make a computation because the case involved "an 'open ended' purchase order involving application of a pricing formula and negotiations between the parties, all in accordance with a prior course of dealing."

The present case involves a single construction contract. Respondent in response to appellants' Interrogatory No. 17 mailed to appellants on October 20, 1966, a carefully itemized accounting of all disbursements including the check numbers, names and addresses of the payees, amounts and dates, and description of the nature of the payment. The court, accordingly, granted prejudgment interest, not from the date upon which construction was completed, but from the date upon which respondent provided the owners with the required accounting and supporting data. The court found that upon that date respondent acquired a vested right to payment of the balance due for the extra work and excess labor costs.

The California Supreme Court, after considering a contention similar to that now raised by appellants, recently concluded: "Defendant next

urges that interest should not have been awarded because plaintiff's original demand of damages exceeded the amount awarded. The approximate net amount of the excess was around $7,000. . . . The mere fact that there is a slight difference between the amount of damages claimed and the amount awarded does not preclude an award of prejudgment interest (*Koyer* v. *Detroit Fire & Marine Ins. Co.,* 9 Cal.2d 336, 345 [70 P.2d 927]), and the erroneous omission of a few matters from the account or erroneous calculation of the costs do not mean that the damages are not capable of being made certain by calculation." (*Coleman Engineering Co.* v. *North American Aviation, Inc.,* 65 Cal.2d 396, 408-409 [55 Cal. Rptr. 1, 420 P.2d 713]; see also *Overland Machined Products, Inc.* v. *Swingline, Inc.,* 263 Cal.App.2d 642, 649-650 [69 Cal.Rptr. 852].)

Appellants were well aware by October 20, 1966, approximately 21 months after completion of the work of construction, that the amount expended by respondent and Centron substantially exceeded the $1,350,-000 theretofore paid by appellants on the contract, and the only substantial matter in dispute was the amount to which appellants were entitled by way of setoff. It is well established that an unliquidated counterclaim will not render a claim so uncertain that the right to prejudgment interest is defeated. ▉▉▉ "[W]here the amount of the demand in itself is sufficiently certain, the fact that there is an unliquidated setoff or counterclaim will not prevent an award of interest on the claim due to plaintiff." (*Worthington Corp.* v. *El Chicote Ranch Properties, Ltd.,* 255 Cal.App.2d 316, 322 [63 Cal.Rptr. 203]; *Anselmo* v. *Sebastiani,* 219 Cal. 292, 301 [26 P.2d 1].)

The judgment is affirmed.

Roth, P. J., and Wright, J., concurred.